THE PEOPLE OF THE STATE OF ILLINOIS *et al.*, Plaintiffs-Appellees, *v.*
TOMMIE DEAN CONNER, Defendant-Appellant.

First District (5th Division)   No. 62874

Opinion filed September 10, 1976.

James J. Doherty, Public Defender, of Chicago (Thomas F. Finegan, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Iris E. Sholder, and Timothy D. Quinn, Assistant State's Attorneys, of counsel), for appellees.

Mr. PRESIDING JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant was convicted of disorderly conduct

and obstructing a police officer in violation of section 193—1(b) of the Chicago Municipal Code (Chicago Municipal Code, ch. 193, §193—1(b)) and section 31—1 of the Criminal Code (Ill. Rev. Stat. 1973, ch. 38, par. 31—1). He was fined $25 for disorderly conduct and sentenced to 30 days in the House of Correction for obstructing a police officer. On appeal, defendant contends: (1) he may not be convicted of both disorderly conduct and obstructing a peace officer, when both convictions are based upon the same conduct, (2) his conduct was legally insufficient to constitute the offense of obstructing a police officer, and (3) it was prejudicial error for the prosecutor during closing argument to comment on his failure to testify.

Defendant's brother, James Conner, was tried and convicted along with defendant, however, his case is not on appeal. At trial the following pertinent evidence was adduced.

*For the State*

   *George Leverette*

He is a Chicago police officer. On May 7, 1973, at about 9:30 p.m., he and Officer Nathaniel Patterson were in uniform and on duty in a marked police car approaching 71st Street and Racine Avenue. There, he observed 10 to 15 men on the southeast corner of the intersection cursing, drinking, and hollering at passers-by. He told the men to disperse and they all left except for James Conner, defendant's brother. Again, he told Conner to leave, whereupon Conner began crossing Racine Avenue. When he reached the centerline, Conner turned and said, "M————— f————" and then continued into Ziggie's tavern. He followed him into the tavern and asked him to repeat what he said. Conner at first denied he was speaking to him, then denied saying anything. When asked a third time, Conner replied, "M————— f————s—both of you" and kicked him in the thigh. Patterson attempted to arrest Conner and a scuffle ensued. He grabbed Conner's leg and they all fell to the floor. The officers finally managed to handcuff Conner and prepared to leave, however, a group of men assembled at the door. As his partner was calling for help, Tommie Conner, the defendant, came into the tavern, saw James Conner standing between the two officers, and said, "Turn him [James Conner] loose. That is my brother; or I will kill you." As he said this, he took off his jacket revealing a shoulder holster located just below his left arm pit. There was no weapon in the holster. Immediately, Officer Leverette drew his service revolver and told defendant to stay back or he would shoot him. An unknown man grabbed defendant from the rear and held him, however, defendant continued to struggle to free himself. James Conner hollered to defendant, "Stay out of this" and others in the tavern screamed similar warnings. However, defendant "kept it up,"

saying, "Turn him loose; that is my brother; I will kill you; I will kill you." A minute ot two later assisting police units arrived and defendant was arrested.

On cross-examination he admitted that although he did say in his police report that defendant was wearing a shoulder holster, he failed to mention anything about defendant removing his jacket. Further, he acknowledged, he was 10 to 15 feet away from defendant when defendant was grabbed.

On re-direct examination he said that although four or five people were directly between himself and the tavern door he still had a "clear unobstructed view" of defendant when defendant entered the tavern.

### Nathaniel Patterson

He is a Chicago police officer and was Officer Leverette's partner on May 7, 1973. He corroborated the testimony of Officer Leverette. In addition, he testified that there were 20 to 30 people in Ziggie's tavern at the time of James Conner's arrest, seven or eight of which were among those on the street corner a short time before. He estimated that the struggle with James Conner lasted four to five minutes.

On cross-examination he admitted defendant never reached him or his partner before someone grabbed defendant.

### Zigmas Sefelras

He is also known as Mr. Ziggy and is the owner of the tavern at which this incident occurred. On the date in question at about 9:30 p.m. he was working alone at his store. He saw the police arrest James Conner. After struggling with Conner they handcuffed him, and defendant came into the tavern. Defendant took off his coat and it "look like he [defendant] got a gun." Defendant had a leather strap in his left side. A police officer pulled a gun and said, "Stop. Don't move." Defendant did "nothing; he just froze." Defendant was then handcuffed.

On cross-examination he testified that defendant spoke when he entered the tavern, but he does not know what was said because he was not paying attention.

### For defendant

### James Conner

He is defendant's brother. After the police officers handcuffed him, defendant walked into the tavern and asked, "What's wrong JD." He replied, "Nothing, just stand back. Don't get involved." No one was between the police officers and defendant. Officer Patterson drew his revolver and said to defendant, "Now m———— f————, don't stand back; come on closer so I can blow your head off." Defendant moved back to the bar and kept saying, "That's my brother." Defendant had a shoulder holster on.

On cross-examination he admitted defendant crossed the room to

within four feet of him after entering the tavern. Defendant did not shout, but said, "This is my brother, what are you doing to my brother?"

*Steven Sneed*

He witnessed the arrest of James Conner and defendant. Prior to the incident in the tavern, he had been on the corner of 71st Street and Racine Avenue with James Conner. His direct examination substantially corroborated the testimony of James Conner.

On cross-examination he admitted being a close friend of both defendant and James Conner. When defendant entered the tavern he said, "What is going on?" Defendant did not threaten the officers or demand they let James Conner go. The only other thing he heard defendant say is, "That's my brother." He would have known if defendant had said anything else, because he was standing right next to defendant, three to six feet from where James Conner was being held. He and defendant had their backs to the bar and were facing Officer Patterson. No one grabbed or restrained defendant. Although defendant was upset and shouting, defendant was not shouting loudly and stood in place when he spoke. Defendant did not remove his jacket, however, defendant's shoulder holster was visible because his jacket was unbuttoned.

During closing argument defense counsel told the jury:

"* * * I think I might have promised you both defendants would testify. Well, I broke that promise. One defendant, Tommie Conner, didn't testify, and why I didn't put Tommie Conner on the stand to testify, whatever my reasons were for not putting him on the stand, I don't want you to hold that against him because an individual never has to take the stand.

As we instructed you earlier * * * during the voir dire, that is up to the State to prove the individual guilty beyond a reasonable doubt. The people who are charged with a crime don't have to take the stand if they don't want to. I am just once again telling you so you will understand.

\* \* \*

Let's get to the testimony about Tommie. Tommie didn't testify, and the reason he didn't "testify is because the State doesn't have a case against Tommie. They've got the weakest possible case. Their case is so weak, * * *."

In rebuttal to the remarks of defense counsel, regarding defendant's failure to testify, the prosecutor commented:

"And I will tell you why Tommie didn't testify. He [defense counsel] says, 'Well, we didn't hear him testify because it was a weak case.' The inconsistencies were building up and building up. They didn't dare put him on there."

OPINION

■■ The State correctly agrees with defendant's first contention that he cannot be convicted of both obstructing a peace officer (Ill. Rev. Stat. 1973, ch. 38, par. 31—1)[1] and disorderly conduct. (Chicago Municipal Code, ch. 193, §193—1(b).) Where, as here, both charges are founded upon a single act of defendant there can be but one conviction. (See *People v. Lilly* (1974), 56 Ill. 2d 493, 309 N.E.2d 1; *People v. Stewart* (1970), 45 Ill. 2d 310, 259 N.E.2d 24.) The conviction of the lesser offense of disorderly conduct is, therefore, reversed.

Defendant next contends that his conduct was legally insufficient to constitute the offense of obstructing a peace officer. Characterizing his conduct as at most an "idle threat", defendant cites *Landry v. Daley* (N.D. Ill. 1968), 280 F.Supp. 938, and *People v. Raby* (1968), 40 Ill. 2d 392, 240 N.E.2d 595, for the proposition that words alone do not constitute obstructing a peace officer. Rather, he insists there must be "some physical act which imposes an obstacle which may impede, hinder, interrupt, prevent, or delay the performance of the officer's duties, such as going limp, forcefully resisting arrest or physically aiding a third party to avoid arrest." *Landry v. Daley* (N.D. Ill. 1968), 280 F. Supp. 938, 959.

■■ While defendant did not come in physical contact with either arresting officer, his conduct extended beyond mere words and constituted obstruction under section 31—1 of the Criminal Code (Ill. Rev. Stat. 1973, ch. 38, par. 31—1) and as defined by the *Landry* and *Raby* cases. Although, there was conflict in the testimony, the People's evidence, which the jury obviously chose to believe, shows that defendant entered a tavern with a marked police car parked outside and saw his brother, James Conner, standing handcuffed between two uniformed police officers. That he was being arrested was obvious. Nonetheless, defendant removed his jacket, revealing a shoulder holster and threatened to kill the officers if they did not release his brother. James Conner acknowledged that defendant walked across the room to within four feet of the officers. Moreover, it was necessary for an unknown citizen to restrain defendant, who struggled to free himself despite repeated warnings from his brother, other bystanders and the police officers who had their weapons drawn. That defendant failed to come in physical contact with the officers makes his actions no less culpable. His conduct occurring on the heels of a four- to five-minute struggle between police and his brother and in the midst of a hostile crowd, come well within the definition of obstructing a peace officer as set forth in the

---

[1] Section 31 of the Criminal Code (Ill. Rev. Stat. 1973, ch. 38, par. 31—1) provides:
"A person who knowingly resists or obstructs the performance by one known to the person to be a peace officer of any authorized act within his official capacity commits a Class A misdemeanor."

*Landry* and *Raby* cases. Certainly the acts of defendant impeded and delayed the performance of the officers' duties.

Lastly, defendant contends that although it may have been proper to comment on defendant's failure to testify because defense counsel raised the matter in his closing argument, nonetheless he insists that it was prejudicial error for the prosecutor to continue his remarks by stating the reason he believed defendant did not testify.

The prohibition against comment on defendant's failure to testify, insofar as State prosecutions, was established in *Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229. The court felt there should be no penalty "for exercising a constitutional privilege" and while the jury was left to draw its own inferences as to why a defendant failed to testify, it would be improper to draw those inferences for them. (*Griffin v. California* (1965), 380 U.S. 609, 614, 14 L. Ed. 2d 106, 109-110, 85 S. Ct. 1229, 1233.) However, when counsel for defendant attempts to explain his client's silence, the issue is now before the jury and the rationale behind the rule ceases. See *People v. Finney* (1967), 88 Ill. App. 2d 204, 232 N.E.2d 247, *cert. denied*, 392 U.S. 936, 20 L. Ed. 2d 1394, 88 S. Ct. 2304.

■■ *People v. Carruthers* (1974), 18 Ill. App. 3d 255, 309 N.E.2d 659, which involved circumstances nearly identical to the instant case, held that where defense counsel raises the subject of defendant's failure to testify he thereby opens the subject to fair comment. We agree. Where the prosecutor's remarks concerning defendant's failure to testify are in the form of a response to defense counsel's comments in. closing argument, "defendant may not predicate error on a response by the prosecutor which he himself provoked." *People v. Carruthers* (1974), 18 Ill. App. 3d 255, 267, 309 N.E.2d 659, 668.

Nor do we believe that the Assistant State's Attorney exceeded the bounds of proper rebuttal as defendant suggests. Counsel for defendant initially raised defendant's failure to testify and offered a specific reason for that silence. The prosecution merely responded to counsel's remarks and presented to the jury an alternative inference to be drawn from defendant's silence.

For the foregoing reasons we reverse defendant's conviction for disorderly conduct, and affirm his conviction for obstructing a police officer.

Reversed in part; affirmed in part.

SULLIVAN and DRUCKER, JJ., concur.