THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GREGORY SMITH, Defendant-Appellant.

First District (2nd Division)   No. 82—1773

Opinion filed September 18, 1984.—Rehearing denied October 17, 1984.

Steven Clark and Karen Daniel, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat,

Kevin Sweeney, and Robert W. Bertucci, Assistant State's Attorneys, of counsel), for the People.

JUSTICE STAMOS delivered the opinion of the court:

Defendant Gregory Smith was charged by indictment with murder, attempted murder, burglary, aggravated battery, home invasion, and two counts of armed violence predicated on murder and attempted murder, respectively. Following a jury trial, defendant was convicted on all counts, and judgment was entered accordingly. Defendant was sentenced to concurrent terms of 60 years' imprisonment for murder, 10 years for attempted murder, 7 years for burglary, 10 years for home invasion, and 10 years for armed violence. Defendant appeals.

Regina Tatton resided in a two-story home at 7042 South Bell in Chicago. Tatton's niece, Marian Hyllen, and Hyllen's adult son, Edward Boyle, resided with Tatton. On the night of March 26, 1981, Tatton, Hyllen, and Boyle were asleep in their respective upstairs bedrooms; Boyle closest to the stairway, Tatton furthest from the stairs and Hyllen in between. At about 1:20 a.m. on March 27, Tatton was fatally stabbed by an intruder.

Hyllen testified that she woke up and started into Tatton's bedroom when she heard Tatton scream. Before she entered the bedroom, Hyllen saw Boyle run out of Tatton's room and down the stairway and she heard Boyle scream, "Greg, you S.O.B." Hyllen entered Tatton's bedroom and again heard Boyle scream, "Greg, you S.O.B." Boyle then came back upstairs to Tatton's room and said to Hyllen, "That's okay, ma, I know where to get Greg."

Officer Stanley Wonsowicz and his partner arrived at Tatton's home at about 1:25 a.m. on March 27. Boyle met Wonsowicz at the door and Wonsowicz noticed that Boyle was bleeding. Boyle told the officer not to worry about him but rather attend to his aunt, who was upstairs. Officer Wonsowicz proceeded with Boyle up to Tatton's bedroom. The officer observed Tatton lying on her back while bleeding from her chest. Boyle was standing in the bedroom doorway. Over defense counsel's objection, Wonsowicz was permitted to testify that Boyle said, "I can't believe Greg Smith did it." The officer then took Boyle downstairs to question him about the stabbing.

Once downstairs, Boyle told the officer that he was awakened by Tatton's scream and he went to his doorway, where he saw Gregory Smith run out of Tatton's bedroom. Boyle told the officer that he fought with Smith and that Smith cut Boyle's back and finger. Boyle pointed to a pair of shoes lying on the kitchen floor and stated that

they belonged to Smith. Wonsowicz also testified that Boyle said to him, "Why don't you get that sonofabitch [sic] Greg." Boyle stated that Smith had been wearing red pants and no shoes.

Edward Boyle died prior to Smith's trial.

The police subsequently went to Smith's home where his mother, Mrs. Henrietta Smith, permitted them to search. No evidence was discovered. Defendant was subsequently arrested and taken to the police station for questioning. Initially, Smith said he did not know anything about Regina Tatton's death. When Officer James Higgins told Smith that Boyle had seen Smith come out of Tatton's home, Smith said that he had been there but only as a lookout. Higgins then told Smith that Boyle said that he had struggled with Smith, and Smith responded that he had not gone upstairs and that Johnny Tuck had planned everything. At this point, the police stopped questioning Smith and sought to locate Tuck.

Johnny Tuck testified that on March 26 at 4:30 p.m., he was smoking marijuana and drinking wine in front of his house with Gregory Smith. Tuck testified that Smith said he had a key to Edward Boyle's house and knew where some old coins were. Smith asked Tuck to go with him to Boyle's house, but Tuck refused.

Tuck admitted having fought with Smith on several earlier occasions. There was also evidence that Tuck had assaulted one of Smith's sisters and that Mrs. Smith had filed a criminal complaint against Tuck.

After talking with Tuck, an assistant State's Attorney spoke with Smith and told him that Tuck was not verifying Smith's story. Smith then confessed to stabbing Tatton. He said he was out of work and needed money and knew that Tatton kept money in a purse next to her bed.

Lawrence Hale and his mother Rosemary testified in Smith's defense. They testified that Smith slept at their home on the night of March 26/27 and that at the time Regina Tatton was stabbed, Smith was watching television with Lawrence.

Henrietta Smith testified in her son's defense. Defense counsel attempted to elicit from her the substance of a conversation she had with Edward Boyle after Regina Tatton's death. The State objected to this line of questioning on hearsay grounds, and a sidebar conference ensued. In the conference, defense counsel stated that if allowed to testify, Mrs. Smith would state that Edward Boyle said that he did not know whom he saw coming out of Tatton's room. Defense counsel also stated that Mrs. Smith had a tape recording of Boyle's statement. The court sustained the State's hearsay objection and prevented defense

counsel from questioning Mrs. Smith concerning the tape.

Following the close of the evidence, the jury returned guilty verdicts on all counts. Smith waived a jury for purposes of the death penalty hearing. The trial court, after hearing evidence, denied Smith's motion for a new trial and found that the death penalty was not warranted. The court proceeded to sentence Smith to concurrent prison terms of 60 years for murder, 10 years for attempted murder, 7 years for burglary, 10 years for home invasion, and 10 years for armed violence. The court also found that the aggravated battery count was merged into the attempted murder conviction. Smith then instituted this appeal.

■ Defendant first contends that the trial court erred by admitting the hearsay testimony of Officer Wonsowicz. Officers Wonsowicz and Tamberlin were the first to arrive on the scene after the stabbings. Officer Wonsowicz testified that upon arriving at the scene, he met Edward Boyle. Boyle's back was bleeding, and he appeared to be in great pain. Boyle said to Wonsowicz, "Don't worry about me, my aunt is upstairs." Boyle and the officers then ran up the stairs to Regina Tatton's bedroom. The officers entered the room where Tatton lay face up with a large amount of blood coming from her chest. Boyle, who was standing just outside the bedroom door, yelled, "I can't believe that Greg Smith did it." Officer Wonsowicz took Boyle downstairs to the kitchen area, where Boyle explained that he had been lying in bed asleep when he heard a scream, jumped out of bed and went to his bedroom doorway, where he saw Greg Smith running out of Tatton's bedroom. Boyle also told Wonsowicz that he struggled with Smith and that Smith cut Boyle's back and finger. Boyle pointed to some shoes in the kitchen and said they belonged to Smith. Boyle asked Wonsowicz, "Why don't you get that sonofabitch [sic] Greg." Wonsowicz also testified that Boyle told him that Smith was wearing red pants and no shoes.

Defense counsel objected on hearsay grounds each time Wonsowicz testified as to what Boyle told him. At one point, defense counsel insisted that Boyle's statements were not spontaneous declarations, to which the court replied:

"THE COURT: I didn't say it was a spontaneous declaration, I said Boyle's statement to the police about the event was admissible. I didn't say it was admissible on the basis of spontaneous declaration.

MR. DRAPER: Under what theory?

THE COURT: I'm saying it is admissible on the basis that this is a declaration of a witness to the event as to what he saw hap-

pen.

MR. DRAPER: Which is hearsay, obviously.

THE COURT: Well, of course.

MR. DRAPER: For those reasons, since it is not without any particular exception-

THE COURT: Your objection is overruled."

The court was mistaken as to the basis for admitting Boyle's statements to Officer Wonsowicz. There is no exception to the hearsay rule which allows admission of "a declaration of a witness to the event as to what he saw happen." If admissible, the foregoing statements must come under the hearsay exception commonly referred to as spontaneous exclamations.

To qualify under the spontaneous declaration exception to the hearsay rule, a statement must (1) be made in response to an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) be made without time to fabricate; and (3) relate to the circumstances of the occurrence. (*People v. Poland* (1961), 22 Ill. 2d 175, 181, 174 N.E.2d 804.) Defendant does not contend that Boyle's statements do not relate to the circumstances of the stabbing. Rather, defendant contends that the statements were not spontaneous, but were made after sufficient time had passed for Boyle to regain his composure.

In support of his contention defendant points to the fact that prior to the officers' arrival, Boyle had the presence of mind to ask his mother if she had called for an ambulance. Defendant also notes that Boyle immediately told the police upon their arrival not to worry about him. While these statements might indicate that Boyle was calm and had overcome the shock of the stabbing, it could also have been a reflexive reaction on his part to an emergency situation. In any event, the spontaneity of a statement is to be judged from the totality of the circumstances surrounding the event. See *People v. Chatman* (1982), 110 Ill. App. 3d 19, 26, 441 N.E.2d 1292.

In the instant case, Regina Tatton was stabbed at approximately 1:20 a.m. By 1:25 a.m. the police had arrived. Sometime during the five minutes before the police arrived, Boyle struggled with Tatton's assailant, who stabbed Boyle in the back and nearly cut off the tip of one of his fingers. When Boyle met the police at 1:25 a.m., his back and finger were bleeding and he appeared to Officer Wonsowicz to be in great pain.

Boyle and the police immediately ran up to Tatton's bedroom, where they observed her lying on her back with a large amount of blood coming from her chest. In response to this scene, Boyle ex-

claimed, "I can't believe that Greg Smith did it." Under the circumstances, this statement qualifies as a spontaneous declaration. The interval of time between Regina Tatton's stabbing and Boyle's statement was about five minutes. This fact alone clearly does not negate the spontaneity of the statement. (See, *e.g., People v. Chatman* (1982), 110 Ill. App. 3d 19, 26, 441 N.E.2d 1292 (18 hours); *People v. Wilson* (1980), 87 Ill. App. 3d 693, 702, 409 N.E.2d 344 (15-20 mins.); *In re Hatfield* (1979), 72 Ill. App. 3d 249, 257, 390 N.E.2d 453 (5 mins.).) Moreover, the elapsed time, while material in determining spontaneity, is not controlling; the entirety of the circumstances must be examined to determine if there was an opportunity for reflection and invention. (*People v. Chatman* (1982), 110 Ill. App. 3d 19, 26, 441 N.E.2d 1292.) Among the circumstances to be considered is the declarant's mental state at the time of the statement. (See, *e.g., People v. Wilson* (1980), 87 Ill. App. 3d 693, 702, 409 N.E.2d 344 (injured/crying); *In re Hatfield* (1979), 72 Ill. App. 3d 249, 257, 390 N.E.2d 453 ("very, very" nervous and upset).) In the instant case, Boyle had just been stabbed in the back and finger and he appeared to be in great pain. It also appears from the evidence that when he went to Tatton's bedroom with the officers he was getting a good look at his aunt for the first time since the stabbing. In response to seeing his aunt bleeding heavily from the chest, Boyle stated his disbelief that Greg Smith would do such a thing. Under these circumstances, Boyle's statement clearly qualifies as a spontaneous declaration.

Boyle's subsequent statements are not equally supportable.

After his statement outside Tatton's bedroom, Officer Wonsowicz took Boyle down to the kitchen, where Boyle described the events subsequent to Tatton's stabbing. The record does not indicate that Boyle's statements in the kitchen were in response to questioning, but the circumstances indicate that some of Boyle's statements must have been in response to Officer Wonsowicz's queries. The fact that statements are made in response to queries does not automatically negate their spontaneity but it is a factor to be considered. (See *In re Hatfield* (1979), 72 Ill. App. 3d 249, 257, 390 N.E.2d 453.) The circumstance which would appear to prevent Boyle's statements in the kitchen from qualifying as spontaneous declarations is the manner in which they were presented. Boyle described for Officer Wonsowicz what he was doing at the time Tatton was attacked, and he set out his actions following the attack step-by-step. In order to convey this information to Wonsowicz, it would be necessary for Boyle to reflect upon the events that transpired and organize them in his mind. At this point, Boyle has been removed from the gruesome scene in his aunt's bedroom, and he

is no longer reacting to a startling occurrence. Under these circumstances, we find that Boyle's statements in the kitchen do not qualify as spontaneous declarations.

■ The fact that the "kitchen statements" were improperly admitted does not, however, constitute reversible error. Hearsay statements which are erroneously admitted are harmless beyond a reasonable doubt where the statements relate evidence which is merely cumulative of other evidence which was properly admitted. (See *People v. Sanchez* (1982), 105 Ill. App. 3d 488, 492, 434 N.E.2d 395.) In the instant case, the evidence contained in Boyle's kitchen statements implicating defendant was merely cumulative. Boyle had already identified Smith as the assailant by his utterance outside Tatton's bedroom. Moreover, Marian Hyllen had previously testified as to statements made by Boyle after the stabbing which named Smith as the assailant. Defendant does not contest the propriety of the admission of Hyllen's hearsay testimony. Thus, although Boyles' kitchen statements should have been excluded, their admission is harmless error beyond a reasonable doubt and did not, therefore, serve to deny defendant a fair trial.

■ Defendant attempts to make an issue of the trial court's statement that Boyle's statements were not being admitted as spontaneous declarations. But the fact that a trial court gives an erroneous basis for a correct decision does not preclude this court from affirming the trial court's decision. Because of our finding that Boyle's statement outside Tatton's bedroom was a spontaneous declaration, the trial court's decision to admit that statement was correct.

■ Defendant next contends that the trial court erred when it excluded evidence that Edward Boyle stated that he was not sure who had killed Regina Tatton. On direct examination, Henrietta Smith, defendant's mother, was testifying as to a conversation she had with Edward Boyle soon after the attack on Tatton. The State objected on hearsay grounds and defense counsel requested a sidebar conference. In the conference, defense counsel stated that Henrietta Smith, if allowed to testify, would state that Edward Boyle told her that he was not sure whom he saw in Regina Tatton's apartment on the night of the attack. Defense counsel submitted that Boyle's statement to Mrs. Smith should be admitted as a declaration against interest. The court rejected this argument and sustained the State's objection. The State then made a motion *in limine* to exclude any reference to a tape recording Mrs. Smith allegedly made of her conversation with Boyle. The court did not grant the motion, but it excluded a subsequent attempt by defense counsel to question Mrs. Smith concerning the tape. On appeal, defendant contends that Edward Boyle's statement to Mrs.

Smith constituted a prior inconsistent statement and should have been admitted for the purpose of impeaching Boyle's statements identifying defendant as the assailant. The State characterizes Mrs. Smith's proposed testimony as inadmissible hearsay.

In the instant case, the court is confronted with the issue of the admissibility of the statements of an absent declarant. Edward Boyle, who was present at the scene of the crime, died prior to trial. At trial, Boyle's statements that defendant was the assailant were admitted into evidence. Under these circumstances, Mrs. Smith should have been permitted to testify that Boyle told her he was not sure who attacked Regina Tatton.

Where a statement of an absent declarant is properly admitted into evidence under one of the hearsay exceptions, the opposing party may impeach such statement with a prior inconsistent statement by the declarant. See *Commonwealth v. Sellon* (1980), 380 Mass. 220, 224-25 n.6, 402 N.E.2d 1329, 1334 n.6; Fed. R. Evid. 806; see also *Dunn v. People* (1898), 172 Ill. 582, 591, 50 N.E.137; *People v. Conway* (1971), 3 Ill. App. 3d 69, 73, 278 N.E.2d 852.

In response to the State's objection, defense counsel argued that Boyle's prior inconsistent statements should be admitted as a declaration against interest. This argument was erroneous, but it does not impair defendant's right to raise this contention of error on appeal. The basis for the State's objection to Mrs. Smith's testimony was hearsay. However, a prior inconsistent statement submitted for the purpose of impeaching a declarant is not hearsay because it is not being submitted to prove the truth of the matter asserted. (See *People v. Collins* (1971), 49 Ill. 2d 179, 194, 274 N.E.2d 77.) We find that the trial court erred by excluding Mrs. Smith's testimony.

■ Defendant next contends that in closing argument, the prosecutor improperly commented on defendant's failure to testify. The State characterizes the complained-of comments as a proper response to defense counsel's closing argument. The comments in issue are as follows:

> "DEFENSE COUNSEL: Gregory Smith's testimony was not his own. There is no mystery, it is no new thing that people force confessions. Due to his condition, he wasn't able to come forward with his own story and tell you his story through his own mouth but you ladies and gentlemen must utilize not only your experiences in life but your own common sense that a man who is an Assistant State's Attorney will tear up one set of notes, set it in another longhand fashion another set of notes and then type up some other notes and never, ever shows them

to the individual who supposedly says it for the purpose of verifying whether it is accurate."

"PROSECUTION: At the very end of his argument he says Gregory Smith could not tell you out of his own mouth because of his condition. What condition? Gregory Smith did not testify in this case, his choice; but it was not because of any condition. He did not testify because he could not stand up under cross examination.

MR. DRAPER: Objection to that.

THE COURT: Overruled.

MR. O'CONNOR: Because he is a murderer.

MR. DRAPER: Objection.

MR. O'CONNOR: He already once said—

MR. DRAPER: Objection to these continual prejudicial remarks which are unfounded.

THE COURT: Overruled.

MR. O'CONNOR: He already once said what occurred. He told Assistant State's Attorney Sherwin and two police officers. Gregory Smith was afraid to get up there and see what would happen if questions were asked.

MR. DRAPER: Objection.

THE COURT: Overruled.

MR. O'CONNOR: Mr. Draper gave you an explanation as to why he didn't testify. That is the explanation, he could not testify because he would have to lie and he would get caught.

MR. DRAPER: Objection, Judge.

THE COURT: Overruled."

It is clearly improper for the prosecution to comment on a defendant's failure to testify at trial. (*Griffin v. California* (1965), 380 U.S. 609, 615, 14 L. Ed. 2d 106, 110, 85 S. Ct. 1229, 1233; *People v. Burton* (1969), 44 Ill. 2d 53, 56, 254 N.E.2d 527.) If, however, defense counsel comments on defendant's failure to testify and offers an explanation for this failure, the defense has thereby invited the prosecution to refute defense counsel's explanation for defendant's failure to take the stand. (See *People v. Ivery* (1979), 72 Ill. App. 3d 158, 161, 390 N.E.2d 608; *People v. Conner* (1976), 42 Ill. App. 3d 234, 239, 355 N.E.2d 662; *People v. Carruthers* (1974), 18 Ill. App. 3d 255, 266-67, 309 N.E.2d 659; see also *People v. Eddington* (1983), 117 Ill. App. 3d 953, 963, 453 N.E.2d 1383; *People v. Hasting* (1978), 56 Ill. App. 3d 724, 726, 372 N.E.2d 702.) In *Conner*, defense counsel in closing argument commented on his failure to call defendant to testify. Defense counsel stated that the reason defendant did not testify was because " 'the

State doesn't have a case against [defendant].' " (*People v. Conner* (1976), 42 Ill. App. 3d 234, 237.) In rebuttal, the prosecutor stated that the reason defendant did not testify was because "[t]he inconsistencies were building up and building up. They didn't dare put him on [the witness stand]." (42 Ill. App. 3d 234, 237.) The court in *Conner* ruled that " 'defendant may not predicate error on a response by the prosecutor which he himself provoked.' " (*People v. Conner* (1976), 42 Ill. App. 3d 234, 239, quoting *People v. Carruthers* (1974), 18 Ill. App. 3d 255, 267, 309 N.E.2d 659.) The court also held that the prosecutor had not exceeded the bounds of proper rebuttal because he had merely "responded to counsel's remarks and presented to the jury an alternative inference to be drawn from defendant's silence." *People v. Conner* (1976), 42 Ill. App. 3d 234, 239.

In the instant case, defense counsel attempted to do more than explain defendant's failure to testify; he attempted to provide the jury with the substance of what defendant would have testified to had he been able. Defense counsel argued that:

· "[Defendant's] testimony was not his own. There is no mystery, it is no new thing that people force confessions. *** an Assistant State's Attorney will tear up one set of notes, set it in another longhand fashion another set of notes and then type up some other notes and never, ever shows them to the individual who supposedly says it for the purpose of verifying whether it is accurate."

In this statement, defense counsel implied that defendant's confession had been wrongfully coerced and that the signed confession in the State's possession was not the statement given by defendant to his interrogators. Defense counsel also implied that but for a "condition" that prevented defendant from testifying, he would have told the jury about the details of the coercion and the particulars of the actual statement which he gave to the police.

In response to defense counsel's statement, the prosecution argued that defendant did not testify because "he could not stand up under cross examination," because he "was afraid to get up [on the stand] and see what would happen if questions were asked," and because "he would have to lie and he would get caught." All three of these explanations are ways of saying the same thing; they merely explain that defendant did not testify because of the strength of the State's case. Under the cases cited above, this is clearly a proper rebuttal to defense counsel's comments. It may be that the prosecutor overstepped the bounds of proper rebuttal by repeatedly hammering away at his explanation for defendant's failure to testify. But in light of the overwhelm-

ing weight of evidence of defendant's guilt, any error which resulted from the prosecutor's overzealousness would appear to be harmless beyond a reasonable doubt. See *People v. Lawson* (1980), 86 Ill. App. 3d 376, 407 N.E.2d 899.

Defendant's next contention concerns the instructions tendered to the jury by the court. One count of the indictment charged defendant with the murder of Regina Tatton. Accordingly, the jury received the following murder instructions:

"A person commits the offense of murder when he kills an individual without lawful justification if, in performing the acts which cause the death,

he intends to kill or do great bodily harm to that individual; or

he knows that such acts will cause death to that individual; or

he knows that such acts create a strong probability of death or great bodily harm to that individual; or

he is committing the the [sic] offense of burglary."

"To sustain the charge of murder, the State must prove the following propositions:

*First*: That the defendant performed the acts which caused the death of Regina Tatton; and

*Second*: That when the defendant did so, he intended to kill or do great bodily harm to Regina Tatton; or he knew that his act would cause death or great bodily harm to Regina Tatton; or he knew that his acts created a strong probability of death or great bodily harm to Regina Tatton; or he was committing the offense of burglary.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

Naturally, the crime of attempt must have an underlying offense as its subject. In the instant case, the underlying offense is murder. The jury had previously received a murder instruction and the trial court apparently believed that that instruction was sufficient for purposes of the attempted murder count. But attempt is a specific intent crime, and the murder instruction tendered by the court provided that defendant could be guilty of murder even if he did not possess the specific intent to kill. The tendering of such instructions under the circumstances presented here has been held to be error. See *People v. Harris* (1978), 72 Ill. 2d 16, 23-28, 377 N.E.2d 28.

However, the trial court's failure to properly instruct the jury was not objected to at trial and was not raised in defendant's post-trial motion. Under the general rule of waiver, defendant has thereby waived

the issue on appeal. We acknowledge that an exception to the waiver rule exists where there is "grave error" or where the evidence is closely balanced and fundamental fairness requires that the jury be properly instructed. (See *People v. Roberts* (1979), 75 Ill. 2d 1, 14, 387 N.E.2d 331.) In *Roberts*, however, our supreme court was confronted with the precise issue presented in the instant case and held that the over-broad murder instruction did not constitute "grave error." (75 Ill. 2d 1, 14.) Neither does it appear that the evidence is closely balanced. Defendant attacked Edward Boyle after stabbing Regina Tatton to death. Boyle saw defendant leave Tatton's room, and defendant was thereby apprised that Boyle could identify defendant as Tatton's assailant. The weapon used by defendant in his struggle with Boyle was a butcher knife. Defendant used this knife to stab Boyle three times in the upper body, causing a cut six inches long, a deep laceration six to eight inches long, and another cut 10 inches long. Defendant also severed part of Boyle's finger. Under these circumstances it is difficult to say that the evidence was closely balanced on the issue of defendant's state of mind during his attack on Boyle. The evidence was clearly sufficient to allow the jury to infer the specific intent to kill. Accordingly, we find that defendant has waived the issue of the erroneous jury instructions. See *People v. Hasty* (1983), 120 Ill. App. 3d 173, 175-76, 457 N.E.2d 1039; *People v. McClure* (1979), 80 Ill. App. 3d 10, 16-17, 398 N.E.2d 1233; *People v. Lewis* (1979), 75 Ill. App. 3d 259, 285, 393 N.E.2d 1098; *People v. Gore* (1979), 72 Ill. App. 3d 171, 172-73, 390 N.E.2d 925; see also *People v. Roberts* (1979), 75 Ill. 2d 1, 7-16, 387 N.E.2d 331.

■ Defendant next contends that the trial court's imposition of an extended-term sentence was improper. The State argues that because defendant's conduct was brutal and heinous, an extended-term sentence is warranted. Defendant argues that the provision under which the court imposed sentence was not in effect at the time of the crime and that, therefore, this court should reduce his sentence *sua sponte*.

The trial court in the instant case sentenced defendant, on June 18, 1982, to an extended term of 60 years for the murder of Regina Tatton. The normal range of sentences for murder is 20 to 40 years. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1).) The extended-term sentencing statute in effect at the time of sentencing was section 5—8—2 of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—2). In imposing sentence, the court emphasized the fact that defendant's victim was a "senior citizen" (the victim was 81). Thus, it appears that the court imposed the extended sentence on the basis of a provision which allows for an extended term if the victim

was 60 years of age or older. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3.2(b)(3)(ii).) This provision was not in effect at the time of the commission of the crime.

Regina Tatton was murdered on March 27, 1981. The extended-term sentencing statute in effect at that time was section 5—8—2 of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2). That statute does not provide for the imposition of an extended term if the murder victim was 60 years of age or older, although it provides for an extended term if the murder involved brutal or heinous behavior. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(b)(2).) The normal range of sentences for murder at the time of Regina Tatton's death was 20 to 40 years. Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1).

Because the sentencing alternatives available at the time of sentencing differed from those available at the time of the offense, defendant was entitled to be informed that the two sentencing schemes existed and to choose under which one sentence should be imposed. (See Ill. Rev. Stat. 1981, ch. 38, par. 1008—2—4(b); *People v. Fuller* (1980), 91 Ill. App. 3d 922, 930, 415 N.E.2d 502.) Defendant was not, however, informed of the existence of sentencing alternatives and was not, therefore, afforded his statutory right to select one of the two applicable sentencing schemes. Accordingly, defendant's sentence is vacated, and this cause is remanded for resentencing.

■ Defendant next contends that judgment was improperly entered on his armed violence conviction. Defendant was indicted for armed violence predicated on murder and armed violence predicated on attempted murder. The jury, however, was provided with only one armed violence verdict form, which failed to specify an underlying felony. Thus, the jury's finding of guilty on the armed violence count may have been predicated on murder, attempted murder or both. In any event, the armed violence conviction should be vacated. Under *People v. Donaldson* (1982), 91 Ill. 2d 164, 435 N.E.2d 477, convictions for both armed violence and the predicate felony cannot stand where both convictions are based on the same act. Where such convictions result, judgment should be entered on only the most serious class of felony. (91 Ill. 2d 164, 170.) In the instant case, armed violence is a less serious offense than murder and equally as serious as attempted murder. (Compare Ill. Rev. Stat. 1981, ch. 38, par. 33A—3(a), with pars. 8—4(c)(1) and 1005—5—1(b).) Accordingly, the armed violence conviction must be vacated.

■ Defendant's final contention concerns the questioning of prospective jurors regarding their attitudes toward the death penalty. This

questioning was conducted pursuant to and in conformance with the Supreme Court's decision in *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770. Under *Witherspoon*, in a capital case, a prospective juror should be excluded if his attitude toward the death penalty would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath. In the instant case, the jury venire was "Witherspooned" and, as a result, several prospective jurors were excluded. Defendant contends that Witherspooning the jury venire resulted in a jury which was biased in favor of prosecution and which failed to represent a fair cross-section of the community. Our supreme court rejected the "conviction-prone jury" argument in *People v. Lewis* (1981), 88 Ill. 2d 129, 147, 430 N.E.2d 1346, *cert. denied* (1982), 456 U.S. 1011, 73 L. Ed 2d 1308, 102 S. Ct. 2307. The court reaffirmed its holding in *Lewis* in *People v. Tiller* (1982), 94 Ill. 2d 303, 321-22, 447 N.E.2d 174, and *People v. Free* (1983), 94 Ill. 2d 378, 401, 447 N.E.2d 218. The court has also rejected the argument that Witherspooning results in an unrepresentative jury. (See *People v. Free* (1983), 94 Ill. 2d 378, 401-02, 447 N.E.2d 218.) Defendant submits, however, that the decision in *Grigsby v. Mabry* (E. D. Ark. 1983), 569 F. Supp. 1273, warrants a reversal of the law as set forth by the highest court in that State. In *Grigsby*, the court found Witherspooning to be unconstitutional because it produced a conviction-prone jury. In support of its decision, the court in *Grigsby* cited numerous studies purporting to prove that Witherspooning did produce conviction-prone juries. But these studies were all available to our supreme court at the time that *Lewis, Tiller* and *Free* were decided, and presumably the court was aware of their existence but unpersuaded. In any event, in light of our supreme court's clear pronouncements on the issues raised by defendant, we refuse to follow the holding in *Grigsby*.

For the reasons expressed herein, we affirm the judgment of the circuit court. We find that, based upon the weight of the evidence, any error which was committed by the trial court was harmless beyond a reasonable doubt.

The judgment of the circuit court is affirmed in part, reversed in part, and remanded with directions.

Affirmed in part, reversed in part, and remanded.

HARTMAN, P.J., and DOWNING, J., concur.